**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EMPIRE TRUST, LLC by its Trustee, Paul Friedlander on behalf of its beneficiaries, ADMI INC., as Successor Trust-To-Trust Manager of The Baynon Stock Swap Voting Trust Agreement, BAYNON INTERNATIONAL CORP, n/k/a GLOBAL BRANDS CAPITAL CORPORATION, ADMI INC., SIR INC., BRUCE HOULE individually as Trust Beneficiary, and MICHAEL F. GHISELLI, as CEO of ADMI and as individually as a Trust Beneficiary, ADMI INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>JOSEPH R. CELLURA individually as Former Fiduciary-Trustee of Baynon Voting Trust, EMELIA BAER CELLURA, MALIBU 55 INC., DOES 1-3.<br><br>Defendants. | Case No. 7:24-859<br><br>**Verified Civil Complaint**<br><br>1) Securities Fraud-17 CFR 240.10b-5 Exch. Act.<br>2) Fraudulent-Misrepresentation-Inducement<br>3) Breach of Contract<br>4) Prima Facie Tort-Ponzi Scheme<br>5) Conversion-Civil Conspiracy<br>6) Breach of Fiduciary Duty-Constructive Trust<br>7) Accounting & Turnover<br>8) Injunctive Relief/Declaratory Relief<br><br>**Jury Trial Demanded** |

**NOW COMES PLAINTFFS,** EMPIRE TRUST, LLC by its Trustee, Paul Friedlander on behalf of its beneficiaries, ADMI INC., as Successor Trust-To-Trust Manager of The Baynon Stock Swap Voting Trust Agreement, BAYNON INTERNATIONAL CORP, n/k/a GLOBAL BRANDS CAPITAL CORPORATION, ADMI INC., SIR INC., BRUCE HOULE individually as Trust Beneficiary, and MICHAEL F. GHISELLI, as CEO of ADMI and as individually as a Trust Beneficiary, ADMI INC., (hereafter collectively "Plaintiffs entities" and "Plaintiff Beneficiaries") through the Law Offices of Douglas R. Dollinger bringing this action against JOSEPH R. CELLURA individually, and former Fiduciary-Trustee of Baynon Voting Trust Beneficiaries, MALIBU 55 INC., EMELIA BAER CELLURA, and DOES 1-3. (hereinafter, CELLURA or BAER and collectively ("Defendants"), alleging as follows:

**I.**
**Jurisdiction and Venue.**

1.      Subject matter jurisdiction is conferred upon the Court pursuant to 28 U.S.C. § 1331 concerning a federal question for claims asserting Securities Fraud in violation of the 1933 Securities Act and 17CFR §240.10b-5 of the 1934 Exchange Act. Alternatively, Personal Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1332 in that there is a complete diversity of citizenship which exists among the parties with the amount in controversy exceeding the sum of $75,000.00.

2.      The Defendants are subject to specific personal jurisdiction in New York because their contacts with New York as the forum state give rise to the causes of action; each conducts business in and maintains operations in New York or whose individual conduct was directed at the Plaintiffs contractual and property interest here in New York such that for jurisdictional purposes their conduct creates sufficient minimum contacts with New York to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

**II.**
**NATURE OF THE ACTION.**

3.      This Action is brought by the Plaintiffs to recover their money and remaining property interest by putting an end to the Defendants all-too-common place Ponzi Scheme ("Scheme"). The Defendants have and continue to orchestrate their Scheme using multiple corporate entities intended to avoid discovery of their unlawful acts including securities and banking fraud, thus allowing them to embezzle or convert more than Seventeen Million($17,00,000) Dollars from the sale of assets belonging to the individual Plaintiffs, as well as in breach of the return of funds owed to noteholders and other corporate debt obligations of

the Plaintiff entities ADMI INC., SIR INC., and other dissolved holding companies used by the Defendants in their Scheme.

4.      In part, to accomplish their Scheme, the Defendants used these similarly sounding names, as a name associated with Plaintiff-Beneficiaries interest and right to payments due under a written Voting Trust Agreement concerning a written New York licensing agreement with the owners of the decades old and well know public brand name.

5.      The Defendants used these names in the past and it is believed continue to do so even to this date, despite receiving oral and formal written notice from the brand owners to cease and desist their unauthorized use of the brand name and any variations of the brand name including, the dissolved entities.   For the most part, to avoid detection of their theft the Defendants' Scheme used multiple email addresses-message associated with these entities to hide the deception from the Plaintiff-Beneficiaries.

6.      The Scheme has also been successful because the Defendants appoint various unsuspecting individuals as officers and directors of these companies placing them on bank accounts passing funds through multiple bank accounts intended to avoid discovery of the Scheme, doing so to evade bank regulators, compartmentalizing information, raising funds or receiving services using varied unregistered convertible notes among the differing entities at different offering prices doing so while over pledging or otherwise intentionally misdescribing the companies rights to the license agreement, allowing the Defendants to avoid  registration requirements mandated under the Securities Act of 1933, the "truth in securities" the federal law that requires disclosure of financial information and prohibits fraud in the sale of securities under it and the Acts 1934 Amendments. The requirements of these Acts are designed to protect investors by ensuring they are provided adequate and truthful information upon which to base their investment decisions.

7. Although an investigation has provided undeniable proof of the Schemes early-on and extended existence, conduct that unmistakable mirrors a prior Forbes magazine article and Tampa Tribune article about Defendant CELLURA and the disappearance of investors' funds, the Plaintiff-Beneficiary claims begin with Defendants, present unlawful acts which began in March 2020, when the individual parties assumed control of Baynon International Corp., n/k/a GLOBAL BRANDS CAPITAL CORPORATION ("GBCC").

8. At the time, CELLURA requested to act as Trustee for the benefit of the Plaintiff-Beneficiaries EMPIRE TRUST LLC ("EMPIRE"), BRUCE HOULE ("HOULE") and MICHAEL GHISELLI ("GHISELLI") (collectively the "Plaintiff Beneficiaries or VTA Plaintiffs").

9. CELLURA and the Plaintiff Beneficiaries entered into a written Voting Trust Agreements dated April 29, 2020. ("VTA" or " Trust Agreements" Exhibit "A").

10. The Plaintiff-Beneficiaries collective voting powers granted them controlling ownership in GBCC's super majority non-dilutive Series "A" Stock ("A-Shares"). Under the VTA CELLURA was granted the power and authority (which has since expired or been revoked) to administer-manage the voting rights of Plaintiffs swapping their A-Share voting rights granting them to CELLURA requiring him in exchange to deliver all funds received in the sale of both tangible and intangible company assets that would come under his control as an officer and director of the Plaintiff Entities and as the Trustee of the VTA  with payment to be made within 3 days of their receipt.

11. CELLURA has refuse to make payment of the funds received Seventeen ($17,00,000) Million Dollars despite his fiduciary duties as CEO of these Companies and as Trustee of the VTA to ignoring his duties under the law and the VTA, operating nothing more than a pyramid/Ponzi scheme embezzling  and converting the sale proceeds received in the incremental sale and payments intended of the branded license as owed to the Plaintiff

Beneficiaries using a series of layered companies which the Plaintiff-Beneficiaries were told by Cellura were trust-to-trust successor companies of GBCC.

12.    By this action Plaintiffs are seeking accounting-recovery and turnover of the Seventeen ($17,000,000) Million Dollars received by the Defendants in the past 3 years, including the turnover of property, a luxury home and in some cases luxury cars and jewelry unlawfully purchased by the Defendants with both corporate funds and funds the Defendants held as Trustees, funds embezzled or converted and in some cases hidden inside loans and other third-party agreements where the Defendants have unlawfully  pledged corporate assets without board approval and taken the loan proceeds for their own use.

13.    Plaintiffs are also seeking a declaration by the Court granting a partition and sale of all assets of these companies under commercially reasonable terms with payment to an agreed attorneys  escrow and, that disbursements be made from escrow for ALL PARTIES after an accounting as and for their property interest, after offset and after repayment of noteholders and debts obligations of GBCC-ADMI INC., and the other associated holding companies, including, the dissolved entities Sports Illustrated Resorts Inc, and Sports Illustrated Resorts Corp.

14.    Absent judicial intervention, Plaintiffs and the companies note holders are unlikely to ever recover their investments and the Scheme will continue to make victims of innocent investors and the purchaser of the Plaintiff-Beneficiaries property, because they will falsely believe CELLURA may enter into a binding agreement concerning the sale or use of the branded license agreement.  Accordingly, judicial intervention is required and requested to rectify the existing and future irreparable injury and harm facing Plaintiffs, with the continued threat to Plaintiffs outweighing the harm to the Defendants; ensuring the public interest is served; and because it is apparent there is a substantial likelihood of success on the merits to Plaintiffs claims.

### III.
### The Parties.

**Plaintiffs.**

15.    EMPIRE TRUST, LLC, is a Delaware limited liability corporation conducting business at 3 Grace Ave Suite 156 Great Neck, New York 11021, and is acting through its Trustee Paul Friedlander on behalf of its  beneficiaries, owning 10% of the issued and outstanding Super Majority nondilutive Preferred Series A Shares of GBCC.

16.    BRUCE HOULE is an individual  and citizen and resident located in the state of Alabama and Beneficiary of the Baynon Voting Trust owning 23.9% of the issued and outstanding Super Majority nondilutive Preferred Series A shares of GBCC.

17.    MICHAEL F. GHISELLI is a citizen and resident located in the state of California and Beneficiary of the Baynon Voting Trust owning 15.9% of  outstanding Super Majority nondilutive Preferred Series A shares of GBCC, with an additional 30% of ADMI non-dilutive Series A Shares and 30% of the Common Shares for the benefit of various note holders and debts of corporate entities.

18.    ADMI INC., is a Nevada  corporation with its principal place of business located at 104 Charlton St.  1E Front, New York, New York 10014 with secondary offices located at 570 Country Rt 49 Middletown, New York 10940 and is acting through its CEO Michael F. Ghiselli.

19.    SIR INC, is a Nevada corporation with its principal place of business located at 104 Charlton St.  1E Front, New York, New York 10014 with secondary offices located at 570 Country Rt 49 Middletown, New York 10940 and is acting through its CEO Michael F. Ghiselli.

**Defendants:**

20.    JOSEPH R.  CELLURA is a citizen of Florida and resident of the State of Nevada, and was a director and officer of ADMI INC. and Beneficiary of the Baynon Voting

Trust owning 34. 9% of the issued and outstanding Preferred Series A non-dilutive shares of GBCC, and is President and Director of MALIBU55, INC.

21.   EMELIA BAER CELLURA is a citizen and resident of the State of Nevada, was and is the  secretary and treasurer of MALIBU55 INC.

22.   MALIBU55, INC. is a Nevada corporation with its principal place of  business located at 309 Marewood Court, Reno, NV 89511, with  its principal place of business with the State of Nevada.

**Roe & Doe Defendants:**

23.   The true names and conduct of Defendants JOHN DOES 1-3, not known with enough factual certainty to sue in their actual names but by their acts are members of a conspiracy engaged in secreting funds or assisting in the theft of Plaintiffs funds.

24.   Plaintiffs will seek leave of this Court to amend their Complaint to insert the true, full names and characters of each of the DOE Defendants.

## IV.
## Factual Claims

**Facts:**

25.   In or about March 2020, CELLURA and Plaintiff-Beneficiaries agreed to purchase and otherwise acquired controlling interest in BAYNON.

26.   That in or about March 2020, a new Board of Directors was appointed and changed the company's name to GBCC.  Its Board also created and issued a "Series A" Super Majority non-dilutive Voting Convertible Preferred stock.

27.    The outstanding Series A-Share of GBCC  are held as follows:  EMPIRE  was issued and owns 10% (50,000 A-Shares). HOULE was issued and owns 23.9% (119,500 A-Shares.)  GHISELLI was issued and owns 15.9% (79,500 A-Shares.) and CELLURA owns

34.3% (171,500 A-Shares.)  The remaining shares are held in treasury and were made available for debt conversion.

28.    In or about March 2020, GBCC entered discussions with Authentic Brands Group ("ABG") the owners of the Sports Illustrated brand doing so to acquire the license and develop a Sports Illustrated Resorts industry.

29.    In March 2020, the individual parties obtained their A-Shares. Defendant CELLURA requested and agreed to act as Trustee for the benefit of the individual Plaintiffs under written Voting Trust Agreements dated April 29, 2020, so that he could negotiate the purchase of a license agreement to develop destination resorts using the brand name Sport's Illustrated Resorts.

30.    Under the VTA the Plaintiff-Beneficiaries collective A-Shares voting powers granted them controlling ownership in GBCC.  CELLURA was granted the power and authority to administer-manage the voting rights of Plaintiffs swapping their A-Share voting rights giving them to CELLURA requiring him to deliver all funds received in the sale of company assets as under his control as an officer and director of the Plaintiffs entities and as the Trustee within 3 days of their receipt.

31.    After the Defendant CELLURA obtained Plaintiff's voting power, he began to operate ADMI INC., SIR INC., Sports Illustrated Resorts Inc., and Sports Illustrated Resorts Corp, using them as trust-to-trust holding companies acting as CEO and Trustee for the Plaintiff Beneficiaries under the terms of the stock swap.

32.    On or about November 10, 2022, CELLURA told the VTA Plaintiffs he was designating ADMI a trust-to-trust holding company for the benefit and directed GHISELLI to issue its Series A nondilutive stock (ADMI-Stock) as the Trust-to-Trust holding company for the rights interest and payments of the VTA Plaintiffs and company debt.

33.    On or about November 10, 2022, CELLURA was issued 70% of the ADMI-Shares maintaining 34.3% for himself and holding 35.7% as the VTA Trustee and fiduciary for the benefit of EMPIRE, HOULE and GHISELLI with the remaining 30% to be held by GHISELLI for payment of noteholder debt and other company expenses.

34.    After extensive negotiations with ABG on or about June 1, 2021, CELLURA acting as CEO of ADMI and as Trustee for the benefit of the VTA Plaintiffs entered into a branded licensing agreement for the use of the name Sports Illustrated Resorts ("SIR-Lic.). The SIR Lic., was reached with its New York Partners granting them royalty payments, and granting ADMI, together with its partner and co-developer, an ownership interest of 80% held by ADMI and 20% owned by them.

35.    In or about November-December 2021, the co-developer acquired an additional 30% interest of ADMI's 80% interest in the SIR-Lic. After an internal accounting, it has been determined the funds were used to support the Defendants' lifestyle including multiple family trips to Europe, Hawaii, new cars, and other personal items paid for with these funds.

36.    In or about November 2022, ADMI formed SIR as a designated trust-to-trust holding company under the VTA intending to acquire and build both its own brand and Sports Illustrated Resort brand destinations and began purchasing land and options, including one located in Birmingham.

37.    On or about December 17, 2022, post expiration of his exclusive authority to act as Trustee, CELLURA advised the VTA Plaintiffs he had received an offer for the purchase of 50% of ADMI's remaining 50% SIR-Lic., ownership and was negotiating a sale price, and requested the sale be approved by them.

38.     Without notice to the VTA Plaintiffs on January 31, 2023, CELLURA sold 50% of the ADMI SIR-Lic., to a third-party  for Ten ($10,000,000) Million Dollars. The agreement included terms with Seven ($7,000,000) Million Dollars paid at the time of sale. Two additional payments of One ($1,500,000 Million Dollars were due on January 30, 2024, and the second payment is due January 30, 2025, with a payment due to the VTA Plaintiffs as per their ownership interest no later than February 3, 2023.

39.     The agreement also provided for the substitution of the co-developer for a new company and partner maintaining 50% ownership, the third-party maintaining ownership of 25% and ADMI maintaining 25%.

40.     With no chance to stop him, without the approval of the ADMI Board the initial third-party  payment of Seven ($7,000,000) Million Dollars was the ADMI account on January 31, 2023, as intended for the VTA Plaintiffs and to service ADMI note-debts and other invoices but was withdrawn that very same day by CELLURA without warning  wherein CELLURA and deposited into MALIBU55 INC'S' account.

41.     On January 30, 2023, as part of the Kituwah agreement, new co-developer  paid fees of Five Hundred Sixty-Six ($516,666,000) Thousand to ADMI's account. Once again, without warning or a chance to stop him, without the approval of the ADMI Board  the payment was withdrawn that very same day by CELLURA and deposited into MALIBU55, INC'S' account.

42.     On February 9, 2023, due demand for return of these payments was made of CELLURA and BAER.  Each had refused to return or account for the funds.

43.     In or about May 2023, CELLURA was negotiating a potential partnership or sale for the 23.5% of ADMI's remaining interest in SIR Lic.  In advance of the proposed purchase CELLURA

persuaded the prosed partner to loan SIR Six Million ($6,000,000) Dollars on Alabama land and proposed build out as well as a royalty advance and a 10-year data sharing agreement.

44.     On June 3, 2023, the proposed partner agreed to extend the loan but required SIR to transfer all the Alabama real property into ADMI and that ADMI be the signor of the loan.

45.     On June 2, 2023, SIR assigned or otherwise transferred its rights, interest in the Alabama real property to ADMI, via quick claim dead.

46.     On June 5, 2023, the proposed partner made the loan to ADMI depositing the funds directly to MALIBU55, INC, falsely believing as CELLURA told them it was the holding company for ADMI and that the ADMI's had Board approved the Six Million ($6,000,000) Dollars loan and granted him the right to deposit the funds directly into MALIBU55, INC'S account.

47.     At no time did CELLURA have the approval of either the ADMI or SIR Board to use corporate assets to secure the loan or otherwise act as collateral.

48.     On June 15, 2023, due demand for turnover of the loan proceeds of Six Million ($6,000,000) Dollars was made of CELLURA and BAER and each had refused to turnover or account for the funds.

49.     That in furtherance of their proposed partnership or purchase of ADMI on September 14, 2023, without ADMI Board approval or the VTA Plaintiffs, the proposed partner wired Four Million Five-Hundred Fifty-One Thousand ($4,551,000) Dollars as a royalty advance due to ADMI into a MALIBU55, INC's. account at the direction of CELLURA.

50.     On September 20, 2023, due demand for return of the Four Million Five-Hundred Fifty-One Thousand ($4,551,000) Dollars as a royalty advance due the VTA Plaintiffs has been made of CELLURA and BAER and each had refused to return or account for the funds.

51.    There can be little doubt, the Defendant CELLURA with the aid of others has abandoned his fiduciary duties as a corporate officer and Trustee cloaking himself in a series of layered corporate entities using intentionally similar corporate names designed to confuse investors which as intended did in fact confuse Plaintiff-Beneficiaries and others.

52.    In or about May 2023, Cellura formally retired from the ADMI and SIR Boards tuning wherein Ghiselli and others assumed control of their Boards.

53.     By operating nothing more than a pyramid/Ponzi scheme CELLURA and BAER have used CELLURA's past authority as CEO of these Companies and as Trustee for Plaintiffs to ignore his fiduciary duties invade ADMI's bank accounts denying payment as Trustee under the Voting Trust Agreement to unlawfully embezzle and convert these funds, more than Seventeen ($17,000,000) Million Dollars received by the Defendants in the past 3 years and has refused to account for the funds or provide for their turnover.

### COUNT I.
### FRAUD IN VIOLATION OF SECTION 10(B) AND RULE 10B-5(C) OF THE EXCHANGE ACT.
**[Against Defendant Cellura]**

54.    The Plaintiffs repeat and reallege and otherwise incorporates paragraphs 1 through last of this Complaint as though more fully set for herein at length.

55.    The terms of the VTA April 29, 2020, VTA constitute an investment contract and are therefore subject to federal and state securities laws, including the registration and sale or swap requirements promulgated thereunder.

(a) Starting in or about March 2020, the Defendants willfully, knowingly, and continuing through to the present, directly or indirectly, by the use and means or instrumentality of interstate commerce, and the use of the mails and wires communications, in violation of the law knowingly or recklessly engaged in acts, practices, and courses of business which have operated, are now operating and will operate as

a fraud in the transfer and sale of Plaintiff securities of securities, would and did use and employ, in connection with the transfer of rights, purchase and sale of employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons.

56.    Defendant CELLURA made and caused to be made false statements and misrepresentations soliciting in the Southern District of New York, the VTA Plaintiff to surrender the voting shares allowing him to negotiate a direct interest for them in the Sports Illustrated Resorts License a resort destination enterprise, and thereby caused Plaintiffs to pledge its securities resulting in the receipt of over Seventeen ($17,000,000) Million Dollars, constituting funds belonging the VTA Plaintiffs fraudulently placing them into the accounts of the Defendants CELLURA and BAER including MALIBU55 INC. and related bank accounts knowingly, and willfully having devised and intending to devise a scheme and artifice to defraud and for the VTA's money and property by means of false and fraudulent pretenses, representations, and promises, to the VTA Plaintiffs and third-parties and did transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing their scheme and artifice, wherein after CELLURA made and caused to be made false statements and misrepresentations soliciting the VTA Plaintiffs in the Southern District of New York, did cause them to surrender the voting rights and then thereafter in furtherance of his fraud instructed them to transmit their rights into ADMI in order to, and thereby allow him to conducted and attempted to conduct such financial transactions by his false statement of fact allowed him to embezzle and convert the VTA Plaintiffs funds in the sale of incremental portions of the SIR Lic.,

wherein said acts  constitute the proceeds of specified unlawful activity, *to wit*: approximately Seventeen Million ($17,000,000) Dollars,  the proceeds of a pyramid scheme involving the VTA Plaintiff A-Share ownership in Sports Illustrated Resorts, wherein CELLURA knew that the transactions were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of his  unlawful activity; and were made to hide the transport, transmittal, and transference of wire transfers-funds from a place in the United States to locations between states knowing that the monetary instrument and funds represented the proceeds of unlawful activity, designed in whole and in part to conceal and disguise the  proceeds of a pyramid scheme involving BAER  concerning the funds owed to the VTA Plaintiffs.

57.     By virtue of the foregoing breaches CELLURA is liable to the VTA Plaintiffs for payment of their percentage ownership as damages and for payment received by him for the benefit of the Plaintiff entity debts.

58.     By reason of the foregoing, Defendant CELLURA with the aid of BAER have violated, and unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

59.     Plaintiffs also seek the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## COUNT II.
### VIOLATION OF SECTION 15(A) (15 U.S.C. § 77L(A)(2)) OF THE SECURITIES ACT.
### [Against Defendant Cellura]

60.     The VTA Plaintiffs repeat and reallege and otherwise incorporate paragraphs 1 through last of this Complaint as though more fully set for herein at length.

61.     By reason of the Defendant CELLURA's ownership in and/or control as a director and officer over GBCC, ADMI INC and SIR, he was a control person of these Companies, within the meaning of Section 15(a) of the Securities Act as alleged herein he was at the time a top-level executive and controlling person in a position to work behind the scenes in orchestrating a Ponzi in the swap of the VTA Plaintiffs securities interest and the sale of the SIR Lic., wherein based on his awareness and Defendant's intentional operation of the Plaintiff entries outside corporate formalities, Defendant CELLURA had and abused the power to influence and control and did influence and control, directly or indirectly, the decisions relating to the sale of the Plaintiff VTA interest including the decision to to negotiate the incremental sale of the 26.5/25 % of the SIR Lic., under the VTA Trust stock swap with ADMI, wherein securities where exchange and granted to CELLURA in consideration of a cash payout.

62.     Defendant CELLURA is culpable by reason of the fraudulent scheme described above in the embezzlement and conversion of the sale proceeds intentionally causing damages in the loss of payments received and value of the VTA Plaintiff's securities by engaging in the intentional acts and omissions described above.

63.     By virtue of the foregoing breaches CELLURA is liable to the VTA Plaintiffs for payment of their percentage ownership as damages and for payment received by him for the benefit of the Plaintiff entity debts.

64.     Accordingly, Defendant CELLURA is liable to the VTA Plaintiffs, the noteholders, and debts of the Plaintiff entities under Section 15(a) of the Securities Act.

65.     Plaintiffs also seek the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## COUNT III.
## BREACH OF CONTRACT.
### [Against Defendant Cellura]

66.     The VTA Plaintiffs repeat and reallege and otherwise incorporate paragraphs 1 through last of this Complaint as though more fully set for herein at length.

67.     The terms of the VTA contract were entered into on April 29, 2020, and constitute a valid contract between the VTA Plaintiff-Beneficiaries and CELLURA.

68.     The terms of the VTA constitute an investment contract and are therefore subject to federal and state securities laws, including the registration requirements promulgated thereunder.

69.     For good and valuable consideration, the terms of the VTA called for CELLURA to act as a Trustee and fiduciary overseeing the disbursement of the funds and proceed received from the sale of both tangible and intangible assets held by GBCC-ADMI and SIR including the SIR Lic., holding the funds for the benefit of the VTA Plaintiffs investments-services wherein their collective ownership constituted majority shareholders interest in GBCC and the trust-to-trust holding companies of ADMI and SIR.

70.     The VTA Plaintiffs relied on, and were dependent upon, CELLURA's promises and agreement to act as a Trustee for their payments in the sale of GBCC's and ADMI-SIR assets with payment to occur within 3 days of funds being received.

71.     That between January 2023, and October 2023, CELLURA received more than Seventeen ($17,000,000) Million Dollars and has breached his contracts with the VTA Plaintiff and to GHISELLI as Trustee of 30% of the ADMI A-Share and 30% of the ADMI Common Share for the benefit of the noteholders and debts owed by GBCC, ADMI and SIR. Rather than

adhere to the express, unequivocal terms of the contracts, CELLURA with the aid of BAER converted the VTA Plaintiffs fund thereby breaching his Agreement and fiduciary responsibilities.

72.     By virtue of the foregoing, breaches CELLURA is liable to the VTA Plaintiffs for payment of their percentage ownership as damages and for payment received by him for the benefit of the Plaintiff entity debts.

73.     Plaintiffs also seek the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

### COUNT IV.
### FRAUDULENT MISREPRESENTATIONS & INDUCEMENT.
### [Against Defendant Cellura]

74.     The VTA Plaintiffs repeat and reallege and otherwise incorporate paragraphs 1 through last of this Complaint as though more fully set for herein at length.

75.     CELLURA, by the acts of both omission and commission made to the VTA Plaintiffs, each of which were knowingly, and intentionally false or otherwise misleading statements of material facts intended to deceive the VTA Plaintiffs about the Trustee services CELLURA agreed to provide as Trustee induced the VTA Plaintiffs to enter into the VTA.

76.     Specifically, CELURA representations to the VTA Plaintiffs that, among other things:

> (i) He would act as Trustee and negotiate on their behaves for the purchase of the SIR Lic., and future sale of it as an asset concerning both its tangible and intangible value using his best efforts and would not engage in self-dealing I his position as an officer and director during his negotiation and the actual sale of the assets; and

(ii)  That he would act as Trustee follow the law as a fiduciary and comply with all corporate formalities and any applicable securities and tax laws; and

(iii) That he would create and use as holding companies wherein in his position as Trustee his actions would constitute a stock swap allowing the VTA Plaintiffs to be paid within 3 days of funds received for their percentage of the sale of both the tangible and intangible assets owned by GBCC, ADMI and SIR.

77.    CELLURA knew at the time the statements were made that the statements were false or misleading, intended that the VTA Plaintiff would be induced into action by relying upon the statements of fact made to them and for their benefit.

78.    In considering whether to grant CELLURA the power to act and swap their GBCC A-Shares; the VTA Plaintiffs reasonably and justifiably relied on the statements of fact made to them by CELLURA.

79.    By virtue of the foregoing, breaches CELLURA is liable to the VTA Plaintiffs for payment of their percentage ownership as damages and for payment received by him for the benefit of the Plaintiff entity debts.

80.    Plaintiffs also seek the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

### COUNT V.
### CONSPIRACY UNLAWFUL ACTS OF EMBEZZLEMENT & CONVERSION.
### [Against All Defendants]

81.    The VTA Plaintiffs repeat and reallege and otherwise incorporate paragraphs 1 through last of this Complaint as though more fully set for herein at length.

82. That from at least April 29, 2020, the Defendant engaged in acts, practices, a course of business and conduct which operated as an act of deceit, to embezzle, convert and unlawfully obtain the money belonging to the Plaintiffs.

83. That from as early as July 2020, and continuing, the Defendants, and each of them, acted in concert engaging in a conspiracy agreeing to support their common purpose and plan to embezzle and unlawfully convert more than Seventeen ($17,000,000) Million Dollars in funds owed to the VTA Plaintiffs and Plaintiff entities.

84. The funds VTA Plaintiff and Plaintiff entities actually had the right to possess the funds without interference from the Defendants.

85. That the defendants actually and unlawfully assumed control of more than Seventeen ($17,000,000) Million Dollars that the plaintiff had a right to control and possess, and thereby interfered with the Plaintiff's property in a manner that unlawfully infringed on the Plaintiff's rights.

86. Each Defendant committed at least one overt act in furtherance of such conspiracy including misleading Plaintiff's New York business partners ABG as to the true purpose of their plans concealing the truth intending to facilitate the payment and deliver Plaintiffs' money to them by means described above.

87. Defendants' unlawful conspiracy has directly and proximately caused and continues to cause injuries to the VTA Plaintiffs and in the Plaintiff entities in their business and property interest.

88. Plaintiffs seek an award of compensatory damages for no less that Seventeen ($17,000,000) Million Dollars among other things, for the resultant damages caused by Defendants' unlawful conduct.

**89.** Plaintiffs also seek the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## COUNT VI.
## PRIMA FACIE TORT.
## [Against All Defendants]

**90.** The VTA Plaintiffs repeat and reallege and otherwise incorporate paragraphs 1 through last of this Complaint as though more fully set for herein at length.

**91.** In their attempts to embezzle and convert received more than Seventeen ($17,000,000) Million Dollars, funds intended for payment owed concerning the securities swapped between the VTA Plaintiffs, and CELLURA, CELLURA Defendants has intentionally inflicted harm on all of the Plaintiffs without a lawful right. excuse or justification.

**92.** By virtue of the foregoing, breaches CELLURA is liable to the VTA Plaintiffs for payment of their percentage ownership as damages and for payment received by him for the benefit of the Plaintiff entity debts.

**93.** Plaintiffs also seek the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## COUNT VII.
## EQUITABLE RELIEF CONSTRUCTIVE TRUST.
## [Against All Defendants]

**94.** The VTA Plaintiffs repeat and reallege and otherwise incorporate paragraphs 1 through last of this Complaint as though more fully set for herein at length.

**95.** There was a confidential and fiduciary relationship between the VTA Plaintiffs and CELLURA based on an express promises set forth in the VTA causing the transfer of the VTA Plaintiffs' voting interest in reliance of CELLURA promise to make payment within 3 days of receiving the funds.

96.     By his embezzlement, his refusal to turnover the VTA Plaintiffs funds  and that his and of BAER's conversion  and refusal  to make payment or turnover the SIR Lic., funds the Defendants have been unjustly enriched under circumstances that in equity and good conscience they may  not to retain the VTA's funds or those of the belonging to the noteholders and debts of the Plaintiff entities.

97.     Plaintiffs also seek the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## COUNT VIII.
### DEMAND FOR AN ACCOUNTING.
### [Against All Defendants]

98.     Plaintiffs incorporate by reference paragraphs 1 The VTA Plaintiffs repeat and reallege and otherwise incorporate paragraphs 1 through last of this Complaint as though more fully set for herein at length.

99.     There was a confidential and fiduciary relationship between the VTA Plaintiffs and CELLURA based on the express promises set forth in the VTA.

100.    The Defendants receive more than Seventeen ($17,000,000) Million Dollars and have refused to account for or make payment of the funds or account for the funds.

101.    By reason of the foregoing the VTA Plaintiffs and Plaintiff entities are entitled to an accounting and turnover of all funds held in the accounts they control and for all property purchased and paid for with funds which are determined to have been embezzled or otherwise converted.

## COUNT IX.
### INJUNCTIVE RELIEF.
### [Against All Defendants]

102.    Plaintiffs incorporate by reference paragraphs 1 The VTA Plaintiffs repeat and reallege and otherwise incorporate paragraphs 1 through last of this Complaint as though more fully set for herein at length.

**103.** Defendants' acts of embezzlement and conversion have no nexus to a plausible claim of right, were and are unlawful, wherein Plaintiffs have the right to injunctive relief to avoid irreparable harm.

**WHEREFORE,** by reason of the foregoing, Plaintiffs pray for relief as follows:

A. Compensatory damages for each of the Counts I-VII, together with prejudgment interest on the principal sums due from the dates of embezzlement and conversion to the date of judgment imposed at the maximum rate allowed under the law.

B. Punitive damages for the collective acts of wrongdoing as claim in each of the Count I- VII  in the amount of determined by a jury as a result of the Defendants' specific intent to harm Plaintiffs and the actual harm inflicted on them.

C. An accounting and turnover of funds

D. Injunctive relief.

E. Costs and such other relief as is just and proper.

Dated: February 5, 2024

*Douglas R. Dollinger, Esq.*
Douglas R. Dollinger, Esq., 5922
Law Offices of Douglas R. Dollinger, PC
570 County Rt 49
Middletown, New York 10940
Phone | 845.741.9363
Email ddollingeresq@gmial.com
Attorney for Plaintiffs

EXHIBIT "A"

Signed Voting Trusts Agreements



## VOTING TRUST AGREEMENT FOR THE HOLDERS' OF
## THE SERIES A PREFERRED ANTI-DILUTIVE STOCK

### BAYNON INTERNATIONAL CORP

**Voting Trust Agreement Series "A" Super Majority Anti-dilutive Voting Convertible Preferred Stock, Powers, Preferences, Rights, Qualifications, Limitations and Restrictions of Such A Series of Preferred Stock**

**THIS VOTING TRUST AGREEMENT** (the "Agreement") is made and entered into as of the 29th day of April, 2020 between Empire Trust Corp., by its Trustee (the "Shareholder"), in Baynon Corp, a Nevada corporation (the "Company") and Joseph R. Cellura (the "Trustee"). For all purposes of this Agreement, Empire Trust Corp., holds 10.00% fifty thousand (50,000) shares of the Series A Super Majority Anti-dilutive Voting Convertible Preferred stock ("SMADVP") of the Company as designated by a written agreement with the Company, beginning on the date he as the holder executes this Agreement and his Executive Employment Agreement or other Agreement issued and satisfactory to the Company granting all voting power to the Trustee and the transfer of all of his shares to the Trustee as set forth in terms of paragraphs 2. and 3., hereafter.

**Background Statement**

The Shareholder is the owner and holder of the number shares of the Company (the "Shares") set forth opposite his/her respective name and signature below. The Company is entering, has entered, and/or will enter into other Voting Trust Agreements with certain other holders of its securities-Series A. The Company, the Shareholder and other shareholders of the Series A desire to provide for orderly government of the Company.

**Statement of Agreement**

1. **NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual covenants and agreements herein contained and the transactions contemplated hereby and thereby, the parties hereby covenant and agree as follows:

2. Transfer. The Shareholder hereby assigns to the Trustee the Shares, to be held by the Trustee under the terms and conditions of this Agreement. The Shareholder hereby authorizes and directs the Company to transfer the Shares to the Trustee on the books of the Company. The Company will issue to the Trustee, as trustee, a new certificate representing the Shares and the parties hereby agree to execute and deliver such documents as the Company may reasonably request to effectuate such transaction. The parties hereto acknowledge that the voting trust hereby created shall apply during its term to all Series A securities of the Company (or any successor company) received by Shareholder (or any transferee of the Shares), whether by dividend, stock split, merger, share exchange, liquidation or otherwise. The parties further agree that any cash or other property (other than securities of the Company or Successor Company) received in any such exchange or otherwise for the Shares shall be distributed by the Trustee to the Shareholder as to the percentage of their individual ownership.

2.1 No Change in Control. No provision of this Trust Agreement shall be used to trigger a "change of control" or other similar provision in any of the agreements to which the Company or any of its Subsidiaries is a party, including without limitation "change in control," by the acceleration of the Holder SMADV vested Stock. **The Shareholder** has no intent to effect a "change of control" of the Company as such term is understood under the rules promulgated pursuant to Section 13(d) of the Exchange Act.

3. Voting Trust Certificates. The Trustee will issue to Shareholder a Voting Trust Certificate evidencing their beneficial ownership of the Shares held by the Trustee.





Baynon International Corp

4. Transfer of Voting Trust Certificates. The Shareholder may not transfer his/her Voting Trust Certificates, their interest in the voting trust hereby created or the Shares without the prior written consent of the Trustee. Consent to transfer of Voting Trust Certificates shall not be withheld if the transferee executes and delivers to the Trustee agreements in form and substance reasonably acceptable to the Trustee, whereby the transferee agrees to be bound by this Agreement. To the extent permitted hereunder, any such transfer of Voting Trust Certificates and any subsequent transfers shall be made only on the books of the Trustee by the record holder thereof or by his legal representative, who shall furnish the Trustee with proper evidence of authority to transfer, or by his attorney thereunto authorized by power of attorney duly executed and filed with the Trustee, and on surrender for cancellation of the Voting Trust Certificate.

5. Term. This Agreement will terminate upon (a) the Trustee entering into a commercially reasonable merger and acquisition or sale with the effect of creating an IPO. For purposes of the immediately preceding sentence, a commercially reasonable IPO shall mean the proposed sale whether whole or in part based upon a firm commitment for the purchase of the Series A in an amount of no less than One Hundred Million ($100,000,000), Dollars; (b) May 15, 2021; (c) termination of any lock-up agreement with any other series of shares issued by the Company; (d) mutual agreement.

6. Rights and Duties of Trustee. The trustee will have full power to vote, consent, and otherwise exercise all the voting rights in respect of the Shares held by it hereunder as the Trustee, in its sole discretion deems advisable.

7. Dividends/sale/share exchange. The holders of the Voting Trust Certificates will be entitled to receive any dividends/ sale proceeds or share exchange paid on the shares represented by their Voting Trust Certificates. The Trustee shall direct the Company to make payment or delivery of such dividends directly to the holders of the Voting Trust Certificates within three (3) business day of receipt or action taken.

8. Securities Dividends. If the Company pays a dividend by delivery to the Trustee of securities of the Company or any successor company, the Trustee shall retain and hold any such securities as Trustee pursuant to the terms of this Agreement and will deliver to the holders of the Voting Trust Certificates additional Voting Trust Certificates representing such securities.

9. Successor Trustee. The Trustee may not be removed for any reason. The Trustee may resign at any time by written notice to the registered holders of Voting Trust Certificates. The Trustee may give any person or entity a proxy to vote the Shares, which proxy shall terminate not later than termination of this Agreement. Any such proxy must be in writing signed by the Trustee. Upon the resignation, death or disability of the Trustee, the Company may select a successor Trustee by action of its Board of Directors. The Trustee and its successors as Trustee may act as Trustees hereunder whether or not they are also stockholders of the Company or holders of Voting Trust Certificates hereunder. Except as set forth in this Section 9, no party may assign its right under this Agreement to any other party without the prior written consent of all parties hereto.

10. Notices. Any and all notices, requests, demands or other communications provided for hereunder shall be given in writing and shall be deemed to have been given (a) when received, if delivered in person, (b) one business day after deposit with an overnight delivery service, addressed as set forth on the signature page hereof, or (c) three (3) business days following the mailing thereof, if mailed by certified first class mail, postage prepaid, return receipt requested, addressed as set forth on the signature page hereof.

11. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective devisees, legatees, heirs, successors, administrators, executors, personal representatives, and assigns.

12. Governing Law. This Agreement shall be subject to and governed by the laws of the State of Nevada.





Baynon International Corp

12.1 Nevada's Business Judgment Rule. The Rule shall be strictly construct in favor of the Trustee Joseph R. Cellura, where absent "**intentional misconduct, fraud or a knowing violation of law.**" NRS 78.138(7)(a)-(b), actual criminal fraud or other unlawful act his judgment shall not be substituted by a Court of law or in arbitration.

13. Prior Agreements. This Agreement contains the entire agreement among the parties with respect to the subject matter hereof, and all other prior Agreements are terminated.

14. Amendment. This Agreement may not be amended except with the written approval of all parties.

15. Counterparts. This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, and all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have signed this Agreement this 29 th day of April, 2020.

COMPANY:
**BAYNON INTERNATIONAL CORP**

By:
**JOSEPH R. CELLURA, CEO**

TRUSTEE:

By:
**JOSEPH R. CELLURA, TRUSTEE**

SHAREHOLDER:

By:
**EMPIRE TRUST- Trustee Paul Friedlander**



Baynon International Corp

## VOTING TRUST AGREEMENT FOR THE HOLDERS' OF THE SERIES A PREFERRED ANTI-DILUTIVE STOCK

### BAYNON INTERNATIONAL CORP

**Voting Trust Agreement Series "A" Super Majority Anti-dilutive Voting Convertible Preferred Stock, Powers, Preferences, Rights, Qualifications, Limitations and Restrictions of Such A Series of Preferred Stock**

**THIS VOTING TRUST AGREEMENT** (the "Agreement") is made and entered into as of the 29th day of April, 2020 between Bruce Houle (the "Shareholder"), in Baynon Corp, a Nevada corporation (the "Company") and Joseph R. Cellura (the "Trustee"). For all purposes of this Agreement, Bruce Houle holds 23.90% one hundred nineteen thousand five hundred (119,500) shares of the Series A Super Majority Anti-dilutive Voting Convertible Preferred stock ("SMADVP") of the Company as designated by a written agreement with the Company, beginning on the date he as the holder executes this Agreement and his Executive Employment Agreement or other Agreement issued and satisfactory to the Company granting all voting power to the Trustee and the transfer of all of his shares to the Trustee as set forth in terms of paragraphs 2. and 3., hereafter.

#### Background Statement

The Shareholder is the owner and holder of the number shares of the Company (the "Shares") set forth opposite his/her respective name and signature below. The Company is entering, has entered, and/or will enter into other Voting Trust Agreements with certain other holders of its securities-Series A. The Company, the Shareholder and other shareholders of the Series A desire to provide for orderly government of the Company.

#### Statement of Agreement

1. **NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual covenants and agreements herein contained and the transactions contemplated hereby and thereby, the parties hereby covenant and agree as follows:

2. Transfer. The Shareholder hereby assigns to the Trustee the Shares, to be held by the Trustee under the terms and conditions of this Agreement. The Shareholder hereby authorizes and directs the Company to transfer the Shares to the Trustee on the books of the Company. The Company will issue to the Trustee, as trustee, a new certificate representing the Shares and the parties hereby agree to execute and deliver such documents as the Company may reasonably request to effectuate such transaction. The parties hereto acknowledge that the voting trust hereby created shall apply during its term to all Series A securities of the Company (or any successor company) received by Shareholder (or any transferee of the Shares), whether by dividend, stock split, merger, share exchange, liquidation or otherwise. The parties further agree that any cash or other property (other than securities of the Company or Successor Company) received in any such exchange or otherwise for the Shares shall be distributed by the Trustee to the Shareholder as to the percentage of their individual ownership.

3. Voting Trust Certificates. The Trustee will issue to Shareholder a Voting Trust Certificate evidencing their beneficial ownership of the Shares held by the Trustee.

4. Transfer of Voting Trust Certificates. The Shareholder may not transfer his/her Voting Trust Certificates, their interest in the voting trust hereby created or the Shares without the prior written consent of the Trustee. Consent to transfer of Voting Trust Certificates shall not be withheld if the transferee executes and delivers to the Trustee agreements in form and substance reasonably acceptable to the Trustee, whereby the transferee agrees to be bound by this Agreement. To the extent permitted hereunder, any such transfer of Voting Trust Certificates and any subsequent



Baynon International Corp

transfers shall be made only on the books of the Trustee by the record holder thereof or by his legal representative, who shall furnish the Trustee with proper evidence of authority to transfer, or by his attorney thereunto authorized by power of attorney duly executed and filed with the Trustee, and on surrender for cancellation of the Voting Trust Certificate.

5. Term. This Agreement will terminate upon (a) the Trustee entering into a commercially reasonable merger and acquisition or sale with the effect of creating a demand IPO. For purposes of the immediately preceding sentence, a commercially reasonable IPO shall mean the conversion of the Series A into common shares upon a firm commitment for the purchase of the Series A in an amount of no less than One Hundred Million ($100,000,000), Dollars; (b) May 15, 2021; (c) termination of any lock-up agreement with any other series of shares issued by the Company; (d) mutual agreement.

6. Rights and Duties of Trustee. The trustee will have full power to vote, consent, and otherwise exercise all the voting rights in respect of the Shares held by it hereunder as the Trustee, in its sole discretion deems advisable.

7. Dividends/sale/share exchange. The holders of the Voting Trust Certificates will be entitled to receive any dividends/ sale proceeds or share exchange paid on the shares represented by their Voting Trust Certificates. The Trustee shall direct the Company to make payment or delivery of such dividends directly to the holders of the Voting Trust Certificates within three (3) business day of receipt or action taken.

8. Securities Dividends. If the Company pays a dividend by delivery to the Trustee of securities of the Company or any successor company, the Trustee shall retain and hold any such securities as Trustee pursuant to the terms of this Agreement and will deliver to the holders of the Voting Trust Certificates additional Voting Trust Certificates representing such securities.

9. Successor Trustee. The Trustee may not be removed for any reason. The Trustee may resign at any time by written notice to the registered holders of Voting Trust Certificates. The Trustee may give any person or entity a proxy to vote the Shares, which proxy shall terminate not later than termination of this Agreement. Any such proxy must be in writing signed by the Trustee. Upon the resignation, death or disability of the Trustee, the Company may select a successor Trustee by action of its Board of Directors. The Trustee and its successors as Trustee may act as Trustees hereunder whether or not they are also stockholders of the Company or holders of Voting Trust Certificates hereunder. Except as set forth in this Section 9, no party may assign its right under this Agreement to any other party without the prior written consent of all parties hereto.

10. Notices. Any and all notices, requests, demands or other communications provided for hereunder shall be given in writing and shall be deemed to have been given (a) when received, if delivered in person, (b) one business day after deposit with an overnight delivery service, addressed as set forth on the signature page hereof, or (c) three (3) business days following the mailing thereof, if mailed by certified first class mail, postage prepaid, return receipt requested, addressed as set forth on the signature page hereof.

11. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective devisees, legatees, heirs, successors, administrators, executors, personal representatives, and assigns.

12. Governing Law. This Agreement shall be subject to and governed by the laws of the State of Nevada.

13. Prior Agreements. This Agreement contains the entire agreement among the parties with respect to the subject matter hereof, and all other prior Agreements are terminated.

14. Amendment. This Agreement may not be amended except with the written approval of all parties.





Baynon International Corp

15. Counterparts. This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, and all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have signed this Agreement this 24th day of April, 2020.

COMPANY:
BAYNON INTERNATIONAL CORP

By: _____
JOSEPH R. CELLURA, CEO

TRUSTEE:
By: _____
JOSEPH R. CELLURA, TRUSTEE

SHAREHOLDER:
BY: _____
BRUCE HOULE



## VOTING TRUST AGREEMENT FOR THE HOLDERS' OF
## THE SERIES A PREFERRED ANTI-DILUTIVE STOCK

### BAYNON INTERNATIONAL CORP

**Voting Trust Agreement Series "A" Super Majority Anti-dilutive Voting Convertible Preferred Stock, Powers, Preferences, Rights, Qualifications, Limitations and Restrictions of Such A Series of Preferred Stock**

**THIS VOTING TRUST AGREEMENT** (the "Agreement") is made and entered into as of the 29th day of April, 2020 between Emelia Baer-Cellura, as Trustee by POA for Joseph R. Cellura (the "Shareholder/holder"), in Baynon Corp, a Nevada corporation (the "Company") and Joseph R. Cellura (the "Trustee"). For all purposes of this Agreement, Empire Trust Corp., holds 34.30% one hundred seventy one thousand five hundred (171,500) shares of the Series A Super Majority Anti-dilutive Voting Convertible Preferred stock ("SMADVP") of the Company as designated by a written agreement with the Company, beginning on the date he as the holder executes this Agreement and his Executive Employment Agreement or other Agreement issued and satisfactory to the Company granting all voting power to the Trustee and the transfer of all of his shares to the Trustee as set forth in terms of paragraphs 2. and 3., hereafter.

### Background Statement

The Shareholder is the owner and holder of the number shares of the Company (the "Shares") set forth opposite his/her respective name and signature below. The Company is entering, has entered, and/or will enter into other Voting Trust Agreements with certain other holders of its securities-Series A. The Company, the Shareholder and other shareholders of the Series A desire to provide for orderly government of the Company.

### Statement of Agreement

1. **NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual covenants and agreements herein contained and the transactions contemplated hereby and thereby, the parties hereby covenant and agree as follows:

2. Transfer. The Shareholder hereby assigns to the Trustee the Shares, to be held by the Trustee under the terms and conditions of this Agreement. The Shareholder hereby authorizes and directs the Company to transfer the Shares to the Trustee on the books of the Company. The Company will issue to the Trustee, as trustee, a new certificate representing the Shares and the parties hereby agree to execute and deliver such documents as the Company may reasonably request to effectuate such transaction. The parties hereto acknowledge that the voting trust hereby created shall apply during its term to all Series A securities of the Company (or any successor company) received by Shareholder (or any transferee of the Shares), whether by dividend, stock split, merger, share exchange, liquidation or otherwise. The parties further agree that any cash or other property (other than securities of the Company or Successor Company) received in any such exchange or otherwise for the Shares shall be distributed by the Trustee to the Shareholder as to the percentage of their individual ownership.

2.1 No Change in Control. No provision of this Trust Agreement shall be used to trigger a "change of control" or other similar provision in any of the agreements to which the Company or any of its Subsidiaries is a party, including without limitation "change in control," by the acceleration of the Holder SMADV vested Stock. The Shareholder has no intent to effect a "change of control" of the Company as such term is understood under the rules promulgated pursuant to Section 13(d) of the Exchange Act.

3. Voting Trust Certificates. The Trustee will issue to Shareholder a Voting Trust Certificate evidencing their beneficial ownership of the Shares held by the Trustee.

Page 1 of 3

Baynon International Corp

4. Transfer of Voting Trust Certificates. The Shareholder may not transfer his/her Voting Trust Certificates, their interest in the voting trust hereby created or the Shares without the prior written consent of the Trustee. Consent to transfer of Voting Trust Certificates shall not be withheld if the transferee executes and delivers to the Trustee agreements in form and substance reasonably acceptable to the Trustee, whereby the transferee agrees to be bound by this Agreement. To the extent permitted hereunder, any such transfer of Voting Trust Certificates and any subsequent transfers shall be made only on the books of the Trustee by the record holder thereof or by his legal representative, who shall furnish the Trustee with proper evidence of authority to transfer, or by his attorney thereunto authorized by power of attorney duly executed and filed with the Trustee, and on surrender for cancellation of the Voting Trust Certificate.

5. Term. This Agreement will terminate upon (a) the Trustee entering into a commercially reasonable merger and acquisition or sale with the effect of creating an IPO. For purposes of the immediately preceding sentence, a commercially reasonable IPO shall mean the proposed sale whether whole or in part based upon a firm commitment for the purchase of the Series A in an amount of no less than One Hundred Million ($100,000,000), Dollars; (b) May 15, 2021; (c) termination of any lock-up agreement with any other series of shares issued by the Company; (d) mutual agreement.

6. Rights and Duties of Trustee. The trustee will have full power to vote, consent, and otherwise exercise all the voting rights in respect of the Shares held by it hereunder as the Trustee, in its sole discretion deems advisable.

7. Dividends/sale/share exchange. The holders of the Voting Trust Certificates will be entitled to receive any dividends/ sale proceeds or share exchange paid on the shares represented by their Voting Trust Certificates. The Trustee shall direct the Company to make payment or delivery of such dividends directly to the holders of the Voting Trust Certificates within three (3) business day of receipt or action taken.

8. Securities Dividends. If the Company pays a dividend by delivery to the Trustee of securities of the Company or any successor company, the Trustee shall retain and hold any such securities as Trustee pursuant to the terms of this Agreement and will deliver to the holders of the Voting Trust Certificates additional Voting Trust Certificates representing such securities.

9. Successor Trustee. The Trustee may not be removed for any reason. The Trustee may resign at any time by written notice to the registered holders of Voting Trust Certificates. The Trustee may give any person or entity a proxy to vote the Shares, which proxy shall terminate not later than termination of this Agreement. Any such proxy must be in writing signed by the Trustee. Upon the resignation, death or disability of the Trustee, the Company may select a successor Trustee by action of its Board of Directors. The Trustee and its successors as Trustee may act as Trustees hereunder whether or not they are also stockholders of the Company or holders of Voting Trust Certificates hereunder. Except as set forth in this Section 9, no party may assign its right under this Agreement to any other party without the prior written consent of all parties hereto.

10. Notices. Any and all notices, requests, demands or other communications provided for hereunder shall be given in writing and shall be deemed to have been given (a) when received, if delivered in person, (b) one business day after deposit with an overnight delivery service, addressed as set forth on the signature page hereof, or (c) three (3) business days following the mailing thereof, if mailed by certified first class mail, postage prepaid, return receipt requested, addressed as set forth on the signature page hereof.

11. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective devisees, legatees, heirs, successors, administrators, executors, personal representatives, and assigns.

12. Governing Law. This Agreement shall be subject to and governed by the laws of the State of Nevada.

Page 2 of 3



12.1 Nevada's Business Judgment Rule. The Rule shall be strictly construct in favor of the Trustee Joseph R. Cellura, where absent "intentional misconduct, fraud or a knowing violation of law." NRS 78.138(7)(a)-(b), actual criminal fraud or other unlawful act his judgment shall not be substituted by a Court of law or in arbitration.

13. Prior Agreements. This Agreement contains the entire agreement among the parties with respect to the subject matter hereof, and all other prior Agreements are terminated.

14. Amendment. This Agreement may not be amended except with the written approval of all parties.

15. Counterparts. This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, and all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have signed this Agreement this 29th day of April, 2020.

COMPANY:
BAYNON INTERNATIONAL CORP

By: _____ CEO
JOSEPH R. CELLURA, CEO

TRUSTEE:

By: _____
JOSEPH R. CELLURA, TRUSTEE

SHAREHOLDER:

By: _____
TRUSTEE EMELIA BAER-CELLURA

Page 3 of 3



## VOTING TRUST AGREEMENT FOR THE HOLDERS' OF THE SERIES A PREFERRED ANTI-DILUTIVE STOCK

### BAYNON INTERNATIONAL CORP

**Voting Trust Agreement Series "A" Super Majority Anti-dilutive Voting Convertible Preferred Stock, Powers, Preferences, Rights, Qualifications, Limitations and Restrictions of Such A Series of Preferred Stock**

**THIS VOTING TRUST AGREEMENT** (the "Agreement") is made and entered into as of the 29th day of April, 2020 between Michael Ghiselli (the "Shareholder"), in Baynon Corp, a Nevada corporation (the "Company") and Joseph R. Cellura (the "Trustee"). For all purposes of this Agreement, Michael F. Ghiselli holds 15.90% seventy nine thousand five hundred (79,500) shares of the Series A Super Majority Anti-dilutive Voting Convertible Preferred stock ("SMADVP") of the Company as designated by a written agreement with the Company, beginning on the date he as the holder executes this Agreement and his Executive Employment Agreement or other Agreement issued and satisfactory to the Company granting all voting power to the Trustee and the transfer of all of his shares to the Trustee as set forth in terms of paragraphs 2. and 3., hereafter.

### Background Statement

The Shareholder is the owner and holder of the number shares of the Company (the "Shares") set forth opposite his/her respective name and signature below. The Company is entering, has entered, and/or will enter into other Voting Trust Agreements with certain other holders of its securities-Series A. The Company, the Shareholder and other shareholders of the Series A desire to provide for orderly government of the Company.

### Statement of Agreement

1. **NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual covenants and agreements herein contained and the transactions contemplated hereby and thereby, the parties hereby covenant and agree as follows:

2. Transfer. The Shareholder hereby assigns to the Trustee the Shares, to be held by the Trustee under the terms and conditions of this Agreement. The Shareholder hereby authorizes and directs the Company to transfer the Shares to the Trustee on the books of the Company. The Company will issue to the Trustee, as trustee, a new certificate representing the Shares and the parties hereby agree to execute and deliver such documents as the Company may reasonably request to effectuate such transaction. The parties hereto acknowledge that the voting trust hereby created shall apply during its term to all Series A securities of the Company (or any successor company) received by Shareholder (or any transferee of the Shares), whether by dividend, stock split, merger, share exchange, liquidation or otherwise. The parties further agree that any cash or other property (other than securities of the Company or Successor Company) received in any such exchange or otherwise for the Shares shall be distributed by the Trustee to the Shareholder as to the percentage of their individual ownership.

2.1 No Change in Control. No provision of this Trust Agreement shall be used to trigger a "change of control" or other similar provision in any of the agreements to which the Company or any of its Subsidiaries is a party, including without limitation "change in control," by the acceleration of the Holder SMADV vested Stock. The Shareholder has no intent to effect a "change of control" of the Company as such term is understood under the rules promulgated pursuant to Section 13(d) of the Exchange Act.

3. Voting Trust Certificates. The Trustee will issue to Shareholder a Voting Trust Certificate evidencing their beneficial ownership of the Shares held by the Trustee.



Baynon International Corp

4. Transfer of Voting Trust Certificates. The Shareholder may not transfer his/her Voting Trust Certificates, their interest in the voting trust hereby created or the Shares without the prior written consent of the Trustee. Consent to transfer of Voting Trust Certificates shall not be withheld if the transferee executes and delivers to the Trustee agreements in form and substance reasonably acceptable to the Trustee, whereby the transferee agrees to be bound by this Agreement. To the extent permitted hereunder, any such transfer of Voting Trust Certificates and any subsequent transfers shall be made only on the books of the Trustee by the record holder thereof or by his legal representative, who shall furnish the Trustee with proper evidence of authority to transfer, or by his attorney thereunto authorized by power of attorney duly executed and filed with the Trustee, and on surrender for cancellation of the Voting Trust Certificate.

5. Term. This Agreement will terminate upon (a) the Trustee entering into a commercially reasonable merger and acquisition or sale with the effect of creating an IPO. For purposes of the immediately preceding sentence, a commercially reasonable IPO shall mean the proposed sale whether whole or in part based upon a firm commitment for the purchase of the Series A in an amount of no less than One Hundred Million ($100,000,000), Dollars; (b) May 15, 2021; (c) termination of any lock-up agreement with any other series of shares issued by the Company; (d) mutual agreement.

6. Rights and Duties of Trustee. The trustee will have full power to vote, consent, and otherwise exercise all the voting rights in respect of the Shares held by it hereunder as the Trustee, in its sole discretion deems advisable.

7. Dividends/sale/share exchange. The holders of the Voting Trust Certificates will be entitled to receive any dividends/ sale proceeds or share exchange paid on the shares represented by their Voting Trust Certificates. The Trustee shall direct the Company to make payment or delivery of such dividends directly to the holders of the Voting Trust Certificates within three (3) business day of receipt or action taken.

8. Securities Dividends. If the Company pays a dividend by delivery to the Trustee of securities of the Company or any successor company, the Trustee shall retain and hold any such securities as Trustee pursuant to the terms of this Agreement and will deliver to the holders of the Voting Trust Certificates additional Voting Trust Certificates representing such securities.

9. Successor Trustee. The Trustee may not be removed for any reason. The Trustee may resign at any time by written notice to the registered holders of Voting Trust Certificates. The Trustee may give any person or entity a proxy to vote the Shares, which proxy shall terminate not later than termination of this Agreement. Any such proxy must be in writing signed by the Trustee. Upon the resignation, death or disability of the Trustee, the Company may select a successor Trustee by action of its Board of Directors. The Trustee and its successors as Trustee may act as Trustees hereunder whether or not they are also stockholders of the Company or holders of Voting Trust Certificates hereunder. Except as set forth in this Section 9, no party may assign its right under this Agreement to any other party without the prior written consent of all parties hereto.

10. Notices. Any and all notices, requests, demands or other communications provided for hereunder shall be given in writing and shall be deemed to have been given (a) when received, if delivered in person, (b) one business day after deposit with an overnight delivery service, addressed as set forth on the signature page hereof, or (c) three (3) business days following the mailing thereof, if mailed by certified first class mail, postage prepaid, return receipt requested, addressed as set forth on the signature page hereof.

11. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective devisees, legatees, heirs, successors, administrators, executors, personal representatives, and assigns.

12. Governing Law. This Agreement shall be subject to and governed by the laws of the State of Nevada.



Baynon International Corp

12.1 Nevada's Business Judgment Rule. The Rule shall be strictly construct in favor of the Trustee Joseph R. Cellura, where absent "**intentional misconduct, fraud or a knowing violation of law.**" NRS 78.138(7)(a)-(b), actual criminal fraud or other unlawful act his judgment shall not be substituted by a Court of law or in arbitration.

13. Prior Agreements. This Agreement contains the entire agreement among the parties with respect to the subject matter hereof, and all other prior Agreements are terminated.

14. Amendment. This Agreement may not be amended except with the written approval of all parties.

15. Counterparts. This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, and all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have signed this Agreement this 29th day of April, 2020.

COMPANY:
**BAYNON INTERNATIONAL CORP**

By: _____
JOSEPH R. CELLURA, CEO

TRUSTEE:

By: _____
JOSEPH R. CELLURA, TRUSTEE

SHAREHOLDER:

By: _____
**MICHAEL GHISELLI**



**VERIFICATION OF COMPLAINT**

I, Bruce Houle, declare as follows pursuant to 28 U.S.C. § 1746.

1.       I am a named beneficiary of a Voting Trust Agreement dated April 29, 2020, and named plaintiff in this action.

2.       I have personal knowledge of the activities, and my intentions, including those set out in the foregoing Verified Complaint for Declaratory and Injunctive Relief, and if called on to testify I would competently testify as to the matters stated therein.

3.       I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning myself, my activities, and my intentions are true and correct, as are the factual statements concerning the defendants activities, and its intentions.

Executed on February 6, 2024

DocuSigned by:

*Bruce Houle*

FD0AFBF2D8824BD...

Bruce Houle-Plaintiff

**VERIFICATION OF COMPLAINT**

I,  Michael F. Ghiselli,  declare as follows pursuant to 28 U.S.C. § 1746.

1.      I am a named beneficiary of a Voting Trust Agreement dated April 29, 2020, and named plaintiff in this action.

2.      I have personal knowledge of the activities, and my intentions, including those set out in the foregoing Verified Complaint for  Declaratory and Injunctive Relief, and if called on to testify I would competently testify as to the matters stated therein.

3.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning myself, my activities, and my intentions are true and correct, as are the factual statements concerning the defendants activities, and its intentions.

Executed on February 6, 2024

_____
Michael F. Ghiselli, Plaintiff

**VERIFICATION OF COMPLAINT**

I,  Paul Friedlander , declare as follows pursuant to 28 U.S.C. § 1746.

1.       I am the Trustee for the beneficiaries of Empire Trust LLC and bring this action on behalf of them.

2.       I have personal knowledge of the activities, and my intentions, including those set out in the foregoing Verified Complaint for  Declaratory and Injunctive Relief, and if called on to testify I would competently testify as to the matters stated therein.

3.       I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning myself, my activities, and my intentions are true and correct, as are the factual statements concerning the defendants activities, and its intentions.

Executed on February 5, 2013

*PAUL H. FRIEDLANER*
_____
Paul Friedlander-Trustee